IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

BETTYE TOLBERT,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        CASE NO. 3:05-cv-159-MEF
                                   )                (WO)
FOLLETT HIGHER EDUCATION           )
GROUP, INC.,                       )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Bettye Tolbert ("Tolbert") brings this action against her former employer,

Follett Higher Education Group, Inc. ("Follett") alleging a claim of retaliation under Title

VII.  Tolbert contends that Follett terminated her in retaliation for her opposition to Follett's

allegedly unlawful employment practices and her participation in another employee's Title

VII suit against Follett.  According to Follett, its decisionmaker was unaware of Tolbert's

conduct, and it had ample legitimate, non-retaliatory reasons for ending her employ.  This

cause is before the Court on the Defendant's Motion for Summary Judgment (Doc. #17) filed

on December 21, 2005.  The Court has reviewed the submissions of the parties and finds, for

the reasons set forth below, that the motion is due to be GRANTED.

### JURISDICTION AND VENUE

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343 and 42 U.S.C. § 2000e.  The parties do not contest personal jurisdiction

or venue, and the Court finds adequate allegations in support of both.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable

2

inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The evidence "adduced at the summary judgment phase must be based on personal knowledge, must set forth specific facts as would be admissible in evidence, and must demonstrate the competence of the party to offer the evidence." *Davis v. Qualico Misc., Inc.*, 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001). The "summary judgment rule in job discrimination cases applies just as in other cases. No thumb is to be placed on either side of the scale." *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).

## FACTS AND PROCEDURAL HISTORY

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts.

Tolbert was employed—initially as a clerk and later as a bookkeeper—at Follett's Tuskegee College bookstore from 1983 until her termination in April 2004. During her tenure, Tolbert was not shy about voicing her disagreements with certain decisions made at the bookstore. In February of 1986, she was discharged for failing to report to work but was reinstated after writing to Follett's former president. Shortly thereafter, Tolbert sent several letters to her regional manager demanding a raise and promising to "not stop writing until I

3

am satisfied with my request."  In 1988, Tolbert wrote to her subsequent regional manager to express her general displeasure with the regional manager's comportment in the store and the lack  administrative support received at the Tuskegee location.  This letter also contained references to racial discrimination on the part of Follett and demanded a raise.  The company's written response provided an explanation of how Follett determines wages and salaries.  Follett also reminded Tolbert of the training the company had provided her and attempted to rebut her accusations of discrimination by pointing to her own reinstatement just two years earlier.  In 1989, Tolbert threatened the company with a lawsuit in connection with garnishments that were being taken out of her paychecks, and one year later, cautioned that she would notify the Department of Labor if Follett did not act to provide her with sick pay.  Later, Tolbert sought worker's compensation from the store after she incurred a paper cut on her thumb.  She also filed a complaint with the Occupational Safety and Health Administration concerning the facilities at the bookstore in 2001.

Throughout this time, Follett did not take any disciplinary or otherwise adverse action against Tolbert for her activities.  In fact, Follett promoted Tolbert to acting store manager in 2000 and gave her a twenty-two percent increase in pay.  Edward Gray ("Gray") eventually filled the store manager position, but Tolbert's pay was not decreased even though she returned to her old job and was no longer performing managerial duties.  Tolbert was ultimately dissatisfied that she did not receive an assistant manager position and voiced her concerns to her new regional manager, Brent Smith ("Mr. Smith").  Mr. Smith informed Tolbert that her current role as senior accounting clerk offered comparable opportunities for

advancement and possessed a higher pay grade level than the assistant manager post. Despite this explanation, Tolbert remained upset that Mr. Smith did not offer her this job and displayed a combative and demanding attitude during the conversation.

In connection with these events, Tolbert refused to sign Follett's company code of conduct in 2001. Follett requires all its employees to sign this form in order to assure their awareness of the company's policies. Mr. Smith referred the matter to Follett's human resources department, and a representative contacted Tolbert about her objections. Eventually, Tolbert signed the 2002 code of conduct but also attached a lengthy handwritten statement on the back of the form that essentially asserted that Follett was not living up to the standards set forth in the code. Tolbert was apparently still bothered by not obtaining the assistant manager position and implied in her statement that discrimination motivated the outcome.

In April 2002, Follett began the introduction of a new computer program, commonly referred to as the JDA system. This software package provided the Tuskegee bookstore with streamlined billing, inventory tracking, and report generating capabilities. Mr. Smith remained at the Tuskegee location for two consecutive weeks as he trained all the employees on the new program. Although most employees made the adjustment without great difficulty, Tolbert believed that she received insufficient training on the new system and continued using outdated procedures. This forced other employees to assume responsibility for some of the tasks formerly handled by Tolbert and rendered her unable to operate the cash registers. Tolbert contends that Gray was supposed to supply her with additional training

opportunities but that he never provided her with adequate assistance.

Tolbert eventually notified Mr. Smith that she had not been taught her how to utilize the new system and that it had not been installed on her computer.  Mr. Smith observed Tolbert's lack of progress with the new system and believed that she displayed an uncooperative and resistant attitude.  As a result, Mr. Smith discussed the situation with his direct supervisor and on a separate occasion with two of Follett's vice presidents.  While visiting the store in August of 2002, Mr. Smith witnessed the great degree to which Gray had taken over Tolbert's responsibilities and noted that she persisted in using discontinued practices.  Mr. Smith again tried to train Tolbert on the JDA system and guided her through the instructional materials.  However, when another manager visited the store a few weeks later, Tolbert had reverted to using the outdated procedures.

In September of the same year, Gray terminated the employment of Jessie Smith ("Ms. Smith"), a clerk at the Tuskegee store, after her register had three large shortages in a three-week period.  Tolbert intervened on Ms. Smith's behalf and told Gray that the shortages were due to register malfunctions and not any fault of Ms. Smith.  Despite her protestations, Tolbert participated as a witness on the standard termination form prepared by Gray. Although she did not reveal any indication on the form or report the incident to any of her other superiors, Tolbert now says that she continued to make her objections known to Gray and did not want to make the attestation but did not believe she had a choice in the matter.

Three months after her termination, Ms. Smith filed a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC").  She alleged that Gray

sexually harassed her beginning in February 2002 and threatened that she would lose her job if she did not submit to his advances.  On May 15, 2003, Ms. Smith filed suit in federal court against Follett based on these incidents.  Her case languished for several months as she was temporarily left without counsel but resumed prosecution in November of that year.  In February 2004, the parties exchanged mutual disclosures in which Follett listed Tolbert and several other store employees as witnesses.  Besides adding herself as a witness, Ms. Smith's witness list simply stated "[a]ll witnesses named by defendant."  Tolbert was not deposed in connection with this case but did provide a statement to Ms. Smith's attorney.  It is unclear whether this statement was given before or after Follett terminated Tolbert in April 2004 or if she rendered any other form of assistance to Ms. Smith in the prosecution and May 2005 settlement of her suit.  Nevertheless, Tolbert has asserted in an affidavit filed with this Court that the February 2004 witness disclosure list somehow notified Follett and Gray that Tolbert would be supporting Ms. Smith in her case.

After Ms. Smith's dismissal, several anonymous phone calls were directed to the Tuskegee store in which the caller would ask for Gray and then either hang-up or make threatening comments.  Gray apparently intimated that Tolbert knew that the caller was Ms. Smith and stated that Tolbert was "skating on thin ice" because she was friends with Ms. Smith.  These statements, made in 2003, compose the only discussion between Tolbert and Gray concerning Ms. Smith's sexual harassment suit.

During this time, Mr. Smith had become concerned about the profitability of the Tuskegee store.  According to Mr. Smith, this location was consistently over budget with

regard to payroll.  From the time he took over supervision of the store in 2001, Mr. Smith had sought to curtail payroll costs by terminating temporary employees and limiting overtime. In January 2004, he began developing a payroll reduction plan for the store in which he designated several employees, including Tolbert, for dismissal and detailed reductions in hours or changes in duties for other workers.  Mr. Smith contends that he considered productivity, performance, skill, potential, attitude, and hourly rate when designing the plan but did not factor in seniority.  After he completed a draft of this proposal in late March of 2004, he sent a copy to Paula Zawojski ("Zawojski") in Follett's central human resources department.  The two then exchanged emails concerning potential changes to the plan as Zawojski asked Mr. Smith to include a description of Tolbert's deficiencies and to be more specific with regard to the job duties each remaining employee would assume.  In the final draft, Mr. Smith made some minor adjustments and also added language that noted Tolbert's failure to handle all the functions associated with her role and stated that she "has a history of absenteeism, is a non-team player and displays a poor attitude to other associates and management."  In his deposition, Mr. Smith testified that he chose Tolbert for termination because she had one of the highest pay rates in the store, did not perform the full slate of duties associated with her job, and had an uncooperative attitude.  Mr. Smith also asserted that he had no knowledge whatsoever of the suit filed by Ms. Smith or of any involvement on the part of Tolbert until July 2004.

On April 22, 2004, Mr. Smith accompanied his supervisor, Bob Scholl ("Scholl"), to the Tuskegee store in order to implement the payroll reduction plan.  Upon their arrival, Mr.

Smith and Scholl communicated the details of the plan to Gray, who had otherwise been unaware of any impending changes.  After this meeting, Mr. Smith and Scholl met with Tolbert and explained to her the history of payroll overages at the Tuskegee location and notified her that her job would be eliminated in an effort to address this problem.  Scholl then attempted to describe Follett's severance agreement to Tolbert and provided her with a copy for her review.  The severance proposal offered Tolbert twenty weeks of pay but also required that she waive the right to bring or participate in any legal action against the company.  Tolbert was not interested in these details and abruptly walked out of the meeting commenting that "They make lawyers for this kind of thing."  Mr. Smith has since proceeded to implement the force reduction as planned and did not hire anyone to replace Tolbert as her tasks have been distributed among existing employees.

After her dismissal, Tolbert contacted Zawojski to inquire why Follett had not considered her length of service and why she had not been offered another position with the company.  Zawojski encouraged her to sign the severance agreement but did not provide an explanation that satisfied Tolbert.  On June 16, 2004, Tolbert filed a charge of discrimination with the EEOC alleging that Follett's decision to terminate her was based on retaliatory motives.  The EEOC concluded that it could not substantiate a violation of the statute from Tolbert's allegations and issued its dismissal and notice of rights on November 30, 2004.  On February 18, 2005, Tolbert filed the instant suit in this Court asserting a single count of retaliation under Title VII.

## DISCUSSION

Title VII "prohibits an employer from retaliating against an employee for enforcing her rights under the act." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006); *see* 42 U.S.C. § 2000e-3(a).  In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established the allocation of the burden of production and an order for the presentation of proof in employment discrimination and retaliation cases where the plaintiff relies on circumstantial evidence to prove her case.  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination or retaliation by a preponderance of the evidence.  411 U.S. at 802.  A prima facie case requires evidence adequate to create an inference that an adverse employment decision was based on an illegal discriminatory or retaliatory criterion.  *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

"[T]o establish a prima facie case of retaliation . . . a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).  First, the Court must examine Tolbert's allegations to determine whether she engaged in statutorily protected conduct.  Title VII prohibits retaliatory action against an employee "because he has opposed any practice made an unlawful employment practice by this [title]; or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing

10

under this [title]."   42 U.S.C. § 2000e-3(a).   "This provision has two components, an opposition clause and a participation clause."  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997).  The participation clause affords exceptionally broad protection to those who take part in any sort of activity related to the development or prosecution of a Title VII case.  *See id.*; *see also Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1006 n.18 (5th Cir. 1969).[1]  The opposition clause is more limited and requires the plaintiff to not only oppose an employment practice, but to have a good faith, reasonable belief that the practice opposed is unlawful.  *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998).  "[T]he objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against the substantive law."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

Tolbert alleges that she engaged in three instances of activity at Follett that were protected by the statute: (1) her opposition of Ms. Smith's firing; (2) her refusal to sign Follett's employee code of conduct; and (3) her participation in Ms. Smith's sexual harassment suit.  Tolbert's first opposition claim does not meet the requirement of a good faith, reasonable belief that the challenged employment decision is unlawful.  Tolbert has repeatedly stated that she opposed Gray's firing of Ms. Smith because Tolbert felt the shortages recorded by Ms. Smith's register were not her fault.  Although there is some evidence to suggest that Tolbert knew of Gray's harassment of Ms. Smith, Tolbert has not

---

[1] Decisions of the former Fifth Circuit rendered prior to October 1, 1981 are binding authority in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

stated that this awareness motivated her actions in any way.  Accordingly, Tolbert did not oppose, or even have a subjective belief that she was opposing, an employment decision because it was based on discriminatory animus.  A disagreement over the propriety of an employment activity is not protected expression where it does not relate to unlawfully discriminatory action on the part of the employer.

Tolbert's refusal to sign the Follett employee code of conduct is representative of the type of behavior protected by the anti-retaliation provisions.  While it is less than clear what Tolbert opposed in taking this action, her general opposition to discriminatory practices in the workplace is protected expression under Title VII.  Likewise, her participation in a fellow employee's Title VII suit is protected expression and falls within the expansive scope of the participation clause.  Tolbert asserts that she was supportive of Ms. Smith's decision to pursue a lawsuit against Follett and that she gave a statement to Ms. Smith's attorney.  These are the type of actions directly contemplated by the statute.

The second element of the prima facie case requires the plaintiff to suffer an adverse employment action.  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quoting *Robinson v. City of Pittsburg*, 120 F.3d 1286, 1300 (3d Cir. 1997)) . Without a doubt, Tolbert's termination constitutes an adverse employment action.  And, the scope of this concept extends to lesser

employment decisions, such as Tolbert's allegation that Gray refused to provide her adequate training. *See Wideman*, 141 F.3d at 1456. Thus, the Court considers both of these instances to represent adverse employment actions.[2]

Once a plaintiff has shown the existence of statutorily protected expression and an adverse employment action, she must demonstrate a causal connection between the two. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). To establish a causal connection, a plaintiff must show "that the protected activity and adverse action are not wholly unrelated." *Clover*, 176 F.3d at 1354 (quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)). This element is satisfied where the plaintiff provides "sufficient evidence that the decision-maker became aware of this protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1997). "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected activity." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001). Also, "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

---

[2] Although the Court did not find that all of Tolbert's actions constituted protected expression, it will, out of an abundance of precaution, consider all three instances as it performs the remainder of the analysis of her prima facie case.

Tolbert's claim is unable to meet this standard because she has not shown that Mr. Smith, the decisionmaker with regard to her termination, was aware of or influenced in any way by the protected conduct when he elected to end her employment.  Mr. Smith has testified that he was unaware of Ms. Smith's lawsuit—much less any participation on Tolbert's part—until the summer of 2004, months after Tolbert's termination.  In fact, Tolbert is not even sure whether her participation in Ms. Smith's suit—which apparently consists of one statement to Ms. Smith's attorney—occurred before or after her termination or whether Follett ever gained access to this document.  Tolbert admits that she did not take any action beyond her verbal objections to Gray or notify Mr. Smith when she opposed Ms. Smith's September 2002 firing.  Thus, she has not established any basis for the Court to conclude that Mr. Smith had any indication that Tolbert supported Ms. Smith in her legal endeavors.  To the contrary, Tolbert's own testimony appears to confirm Mr. Smith's lack of awareness of her affiliation with Ms. Smith.  Perhaps in recognition of this dilemma, Tolbert has sought to inculpate Gray as the motivator of the retaliatory conduct.  However, Tolbert has not provided any evidence to overcome Mr. Smith's assertion that Gray had no involvement in the decision, and her unsubstantiated conjecture is insufficient to construct the necessary causal connection.

Mr. Smith was conscious of Tolbert's refusal to sign the company code of conduct in 2001 and her appended statement to the 2002 version.  However, these events occurred over a year before he drew up the force reduction plan for the Tuskegee bookstore. The Eleventh Circuit has made clear that such a temporal distance is far too great to support an inference

14

of retaliation in the absence of additional evidence.  *See id.* (discussing cases where spans of three to four months have been found too great to establish a causal connection).

The complaint also fails to link Tolbert's lack of training on the JDA system to a retaliatory motive on the part of Gray.  Follett installed the JDA system at the Tuskegee bookstore in April 2002.  Gray did not discharge Ms. Smith until September of that year, and thus, his refusal to provide Tolbert with extra training during the intervening time could not relate to a retaliatory motive.  Outside of one isolated and inconsequential conversation, it does not appear that Gray treated Tolbert any differently after the incident.  By the time Gray fired Ms. Smith, he had already taken over many of Tolbert's duties as she had not developed a minimal aptitude on the JDA system.  Tolbert has not demonstrated any connection between Gray's failure to provide her with training and her opposition to Ms. Smith's termination.  As a result, the Court concludes that Tolbert is unable to sufficiently affiliate any of her protected expression with any of the adverse employment actions taken against her.

Assuming *arguendo* that Tolbert had made out a prima facie case, her claim would still fail.  Once a plaintiff establishes the elements of the prima facie case, thereby raising an inference of retaliation, the defendant must come forward with a legitimate, non-retaliatory reason for the challenged employment action.  *Olmstead*, 141 F.3d at 1460.  The employer's burden is "exceedingly light" and requires only that the defendant produce evidence that could allow a rational factfinder to conclude that the challenged employment action was not made for an unlawful reason.  *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir.

1994). Because the employee always bears the ultimate responsibility for persuading the trier of fact, this burden is one of production, not persuasion. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Where the defendant satisfies this burden, the plaintiff may then attempt to "demonstrate that the defendant's articulated reason is a mere pretext for discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). This opportunity merges with the plaintiff's burden of demonstrating by a preponderance of the evidence that "the employer intentionally discriminated against him because of his race." *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004). "To survive summary judgment, the plaintiff must . . . 'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id*. at 726 (quoting *Chapman*, 229 F.3d at 1024). The plaintiff may face this task by raising "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Id*. (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

Follett has come forward with several non-retaliatory justifications for terminating Tolbert's employment. Mr. Smith explained that the Tuskegee store was consistently over budget on payroll and that Tolbert earned a significantly higher hourly rate than most other workers even though she did not perform many of her assigned tasks. In addition, Mr. Smith found Tolbert to be defiant and combative on several occasions, making her a prime target

16

for separation.  Mr. Smith summarized his rationale for Tolbert's termination in the force reduction plan where he stated that she "has a history of absenteeism, is a non-team player and displays a poor attitude to other associates and management."  These reasons are more than enough to carry Follett's "exceedingly light" burden.

As a result, Tolbert must now marshal sufficient evidence from which a reasonable jury could find Follett's non-retaliatory reasons for her termination pretextual.  Tolbert has theorized that Follett's "corporate counsel" was the "unseen hand" directing the retaliatory actions in this case.  To substantiate this allegation, Tolbert points to Zawojski's request for the insertion of language concerning Tolbert's ineptitude into Mr. Smith's final draft of the payroll reduction plan.  According to Tolbert, "corporate counsel" is the true decisionmaker in this case and, in order to impede Ms. Smith's case, directed Zawojski to take retaliatory actions against Tolbert.  As part of this effort, Tolbert contends that Follett sought to coerce her into signing the company's severance agreement, which included a covenant not to sue or assist another in pursuing legal action against the company.

This argument ignores the fact that the original payroll reduction plan, drafted in January 2004, called for the elimination of Tolbert's position.  Indeed, Tolbert has not challenged the fact that Mr. Smith was unaware of Tolbert's assistance to Ms. Smith.  She has also failed to provide any evidence that would tend to show that Follett's counsel or executives suggested to Mr. Smith that he take this course.  Mr. Smith's addition of derogatory language concerning Tolbert's abilities in his final draft of the plan does not change the ultimate recommendation with regard to her employment at Follett.  Tolbert

17

cannot avoid summary judgment by assigning the necessary retaliatory motive to hypothetical corporate agents.

Tolbert's response to Follett's motion does raise one final issue the Court must consider.  Although she does not do so in her complaint, Tolbert argues in her response that Follett's denial of her severance benefits constitutes retaliatory conduct.  According to Tolbert, she engaged in a protected activity when she complained that the severance agreement and her termination were unlawful, and Follett initiated an adverse employment action by correspondingly denying her severance benefits.

Two important flaws are fatal to this contention.  First, Tolbert has not established that Follett was under any legal obligation to provide her with these benefits.  Without such a demonstration, "[o]ffering severance benefits in return for a general release of claims is neither discriminatory nor retaliatory."  *Davis v. Precoat Metals*, 328 F. Supp. 2d 847, 852 (N.D. Ill. 2004); *see also Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 884 (5th Cir. 2003); *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1508 (10th Cir. 1996); *Bernstein v. St. Paul Co., Inc.*, 134 F. Supp. 2d 730, 733 (D. Md. 2001); *Cronin v. ITT Corp.*, 737 F. Supp. 224, 231 (S.D.N.Y. 1990).  "In such circumstances, the severance benefits 'are properly viewed as additional consideration for an employee's agreement to waive his or her rights and claims.'"  *Davis*, 328 F. Supp. 2d at 852 (quoting *EEOC v. Sears, Roebuck & Co.*, 857 F. Supp. 1233, 1240 (N.D. Ill. 1994)).

Thus, Tolbert could only prevail on this claim if she demonstrated that her preexisting right to the severance benefits was revoked when she threatened legal action.  Although

Tolbert has shown that she was *eligible* for severance benefits, she has not provided any documentation to establish that she was *entitled* to them independent of the completed severance agreement.   The absence of such a demonstration precludes Tolbert from prevailing on this claim and makes summary judgment in Follett's favor the appropriate disposition.

The Fifth Circuit reached the same conclusion when it addressed a similar factual scenario in *Manning*.  332 F.3d 874.  In that case, the plaintiff had already instituted a discrimination suit when he learned that he would be laid off as part of his employer's reorganization.  All employees, including the plaintiff, who were part of the workforce reduction were offered a severance package that contained a waiver of rights as to any legal action against the company.  The plaintiff refused to accept the agreement as it would require him to abandon his pending suit and instead amended his complaint to include a retaliation claim.  The Fifth Circuit affirmed the district court's grant of summary judgment on this claim because the plaintiff was not otherwise entitled to the benefits and the waiver was part of the company's uniform severance policy.  The court concluded that this finding rendered the plaintiff unable to show a causal connection between the protected activity and the company's refusal to award him the severance package.  *Id*. at 884.  The *Manning* court's disposition of the retaliation claim is equally powerful in this case:

> The record shows that [the defendant] required *all* employees to sign the same release form before they could receive the severance package.  Thus, when [the defendant] refused to award [the plaintiff] a severance package, it was simply applying that general policy to [the plaintiff], not retaliating against [her] for bringing an action against the company.

*Id.*; *see also Corneveaux*, 76 F.3d at 1508 (concluding that the plaintiff failed to prove causation where the employer "required completion of a form waiving all claims against [the employer] from all employees prior to disbursing the [benefits]").

The second point the Court finds critical is that Tolbert bases her argument on the severance agreement's bar to future lawsuits and not on her ability to bring a charge with the EEOC. This distinction is crucial because courts have consistently upheld waivers of rights to sue but have found severance agreements that require a plaintiff to waive her right to file a charge with the EEOC to be facially retaliatory. *See, e.g.*, *EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1087 (5th Cir. 1987); *EEOC v. SunDance Rehab. Corp.*, 328 F. Supp. 2d 826, 835-36 (N.D. Ohio 2004). Tolbert's contentions in this case specifically refer only to her right to file a lawsuit and make no mention of EEOC action. As a result, her position falls within the considerable body of case law upholding similar severance agreements, and her claim must be dismissed.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED that the Defendant's Motion for Summary Judgment (Doc. # 17) is GRANTED.

It is further ORDERED that the pretrial conference set for March 23, 2006 is CANCELED, and all other pending motions in this cause are DENIED AS MOOT.

The Clerk of the Court is hereby DIRECTED to remove the above-styled case from the May 1, 2006 trial docket.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 7th day of March, 2006.


_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE